**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

**BRAD ALAN VOORHEES,**

Petitioner,

v.

**DAVID CRIST, Warden,**

Respondent.

Civil No. 01-1516 (JRT/JGL)

**REPORT AND RECOMMENDATION**

APPEARANCES

Brad Alan Voorhees, pro se

Mark S. Rubin, Esq., Assistant St. Louis County Attorney, for Respondent

JONATHAN LEBEDOFF, Chief United States Magistrate Judge

The above-entitled matter is before the undersigned Chief Magistrate Judge of District Court on Petitioner Brad Alan Voorhees' Petition pursuant to 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody. The matter has been referred to the undersigned for a Report and Recommendation pursuant 28 U.S.C. § 636 and D. Minn. LR 72.1(c). For the reasons set forth below, the Court recommends that the petition be denied and the case be dismissed with prejudice.

FILED AUG 1 5 2002
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD
DEPUTY CLERK

## I. FACTUAL BACKGROUND

Petitioner is currently incarcerated at the Minnesota Correctional Facility at Stillwater ("MCF-STW"). David Crist, Respondent, is Warden of MCF-STW. Petitioner filed a petition for a writ of habeas corpus under U.S.C. § 2254 on August 20, 2001. Petitioner has raised numerous claims which can roughly be grouped into four categories; deficiencies in the grand jury process; ineffective assistance of counsel; prosecutorial misconduct; and denial of due process.

### A. Voorhees' Criminal Conduct and Incarceration

The facts, as found by the Minnesota Supreme Court in State v. Voorhees, 596 N.W.2d 241 (Minn. 1999) are as follows. Brad Voorhees and Carolyn Seitz were married in 1993. In 1996, several of their close relatives died and their marriage began to deteriorate. Voorhees, after a period of sobriety, began to drink and stay out all night.

In May 1996, a doctor gave Voorhees a prescription for Prozac, an antidepressant drug. While taking Prozac, Voorhees woke up one night and felt suicidal. Although Carolyn reported to her sister-in-law that her relationship with Voorhees improved while he was on Prozac, he resumed drinking and staying out all night. Carolyn decided the marriage was over and moved out of their apartment with the help of a male friend on July 12, 1996.

After his wife left him, Voorhees lost his job as a driver for a delivery service due to several incidents where his lack of concentration on his work caused him to receive traffic warnings, and to leave $600 worth of live tropical fish in a warehouse where they died. On July 28, after receiving divorce papers, Voorhees called Carolyn at her parents' home and told her he was going to commit suicide by taking pills. She told him if he tried that, he would just end up brain dead with someone feeding him through a straw for the rest of his life. After this phone call, Voorhees called his mother who was able to calm him down.

The week before Carolyn was killed, Voorhees continued to drink. He tried to get into an inpatient treatment program but was only offered outpatient services. On Friday, August 2, he purchased an "eight-ball of crank", a form of methamphetamine. His Prozac ran out on the same day but he did not refill it because he did not think he should take Prozac and methamphetamine at the same time. He continued to drink and use the methamphetamine over the weekend and was unable to sleep as a result.

On Monday, August 5, Voorhees stayed in bed all day but could not sleep. His sister-in-law called and encouraged him to refill his Prozac prescription. At 6:00 p.m., he finished what remained of the methamphetamine and then decided to get straight. He visited his former employer and asked for his job back. Then, he went to Wal-Mart to refill his

Prozac prescription. He arrived at Wal-Mart between 8:00 and 8:30 p.m. and saw Carolyn's car in the parking lot. He parked next to her and went into the store.

Voorhees approached Carolyn and her friend Kandice Linskie at the checkout line. He noticed that Carolyn was purchasing a douche and thought that meant she was seeing someone else. Voorhees tried to talk to Carolyn as she checked out and followed her to the parking lot. She told him to sign the divorce papers and leave her alone. They spoke about their finances and divorce. Linskie stayed in the parking lot with them.

When Carolyn drove away, Voorhees went to a bar and had a mixed drink. He thought about the douche Carolyn had purchased and thought about suicide. He remembered what Carolyn said about trying to commit suicide by taking pills. He testified that was when the idea of a gun popped into his head because he "couldn't fail with a gun."

At approximately 9:00 p.m., Voorhees went back to Wal-Mart and purchased a .22 caliber semi automatic Marlin rifle, the least expensive gun in the store. He filled out the necessary paperwork and also purchased a fifty round box of ammunition. He told the sales clerk the gun was a gift for his nephew. The clerk showed him how to load the gun. The clerk testified that Voorhees was coherent, in a good mood, and did not appear to be under the influence of drugs or alcohol.

Voorhees then went to another bar and had a combination of mixed drinks and beer. The bartender testified that Voorhees did not appear to be drunk or under the influence of methamphetamine when he left the bar.

Voorhees went back to his apartment. He changed into dark clothing. He left a message on his own answering machine stating this was the last message he will ever leave and he was sorry. Voorhees read the owner's manual for the gun and looked at Carolyn's picture and the rings she had left behind. He wrote a note to his mother, telling her he loved her and he was sorry. He then wrote a note: "To who ever really cares- I hope you have a good life! Let this be a lesson to everybody about marriage." Voorhees testified that this is when he decided to shoot himself in front of Carolyn.

At about 2:00 a.m., Voorhees put the rifle in the trunk of his car and drove to Residential Services, Inc. ("RSI"), a home for the disabled where Carolyn was working. At trial, there was testimony from other RSI employees that Voorhees had at times parked and remained in the car on Wicklow, a dead end street where RSI is located, while Carolyn was working. On the night of the killing, Voorhees parked one street up from Wicklow. He testified that he did this so Carolyn would not see him and call the police before he could kill himself in front of her.

Voorhees took the rifle out of the trunk and loaded eleven bullets into the chamber in the dark. He placed the remaining bullets in a sealable

bag and walked down a dark path that led to Wicklow Street. He saw Carolyn walk out of the house, light a cigarette, and walk down the stairs to the corner of the house. When Carolyn saw him, she told him to sign the divorce papers and get out of her life, and that she did not love him and there was someone else.

Voorhees testified that he reacted by pulling the trigger of the rifle until it quit going off. He saw Carolyn fall and ran up the path, dropped the rifle, and got into his car. Neighbors heard screaming around 2:30 p.m. but nobody contacted the police.

Voorhees drove to a store, called his sister-in-law, and told her he had shot Carolyn. She told him to come to her house to turn himself in. He decided not to go to her house because he did not want to upset her or her neighbors when the police came to arrest him. He then went to the Spirit Mountain Motel where he threw out the rifle box and receipt of purchase. At 4:13 a.m. he called 911 from a rest area. The call was recorded. He told the operator that he had shot Carolyn eleven times, explained where her body was, and when he was told nothing had been reported, he said "Shoot, she's probably dead." He stayed on the phone until officers arrived to arrest him.

The arresting officers testified that Voorhees appeared calm and sober when they arrived. He began to cry after he was handcuffed. He repeatedly admitted killing Carolyn and admitted being jealous and hurt when

he saw her purchasing a douche. He did not mention his plan to kill himself until more than five hours after his arrest. During the first formal questioning, he merely said that he planned to go to RSI to sit there for a while and then leave. Upon questioning several hours later, he said he planned to kill himself, not Carolyn, when he went to RSI. He did not tell police that he shot Carolyn because she told him there was someone else. It wasn't until trial that he testified that her admission that there was someone else is what induced him to shoot her.

Voorhees told police where they could find the rifle, ammunition, rifle box and receipt of purchase. Police found Carolyn's body in the location Voorhees described. The medical examiner concluded that she had been shot from many different angles with some of the bullet wounds suggesting she had been shot while lying on the ground.

Voorhees' blood alcohol level at 4:53 a.m. on August 6, 1996 was .03. Blood and urine tests taken at approximately 6:00 a.m. on August 6 indicated 154 millimeters of Prozac in the blood (therapeutic level is 300-1150 milliliters); no methamphetamine in the blood; negligible methamphetamine in the urine and; no alcohol in the blood. The medical examiner testified that if Voorhees had stopped drinking at 1:30 a.m. on August 6, his blood alcohol level would have been between .065 and .07 at the time of the killing.

Voorhees' defense at trial was involuntary intoxication. His theory was that he became involuntarily intoxicated by ingesting a combination of Prozac, methamphetamine and alcohol. An expert witness for the defense testified about the effects such a combination of drugs could have on a person but the trial court did not allow the expert to testify that the combination of drugs caused Voorhees to become involuntarily intoxicated on the night of the killing.

**B. Procedural History**

On September 10, 1996, a grand jury for St. Louis County returned an indictment charging Voorhees with first degree premeditated murder in violation of Minn. Stat. §609.185(1). (Grand Jury Transcript "GJ Tr." at 293-295.) Petitioner was convicted of first degree premeditated murder on July 24, 1997. (Trial Transcript "T. Tr." at 1066-1067). The district court denied Petitioner's motion for a new trial. The Minnesota Supreme Court, on direct appeal, affirmed the conviction. State v. Voorhees, 596 N.W.2d 241 (Minn. 1999).

On direct appeal, the Supreme Court of Minnesota made the following findings. First, Voorhees was not entitled to a jury instruction on involuntary intoxication because he did not make a prima facie showing on any element of that defense. Second, Voorhees was not precluded from testifying about the following: the side effects he felt from Prozac and the combination of

Prozac, methamphetamine and alcohol; whether he was aware of any prohibitions against taking a combination of such drugs; and his state of mind at the time of the shooting. Third, the district court did not err in precluding the testimony of Voorhees' cellmate because his testimony was too remote in time and space from the killing and was not probative from a medical standpoint regarding the effects of drugs on Voorhees.

Fourth, the following evidence was sufficient to support the jury's verdict of premeditated murder: Voorhees and his wife were in the process of a divorce that Voorhees did not want; Voorhees became jealous when he saw Carolyn purchase a douche at Wal-Mart and suspected she was sleeping with another man; shortly after seeing her at Wal-Mart, Voorhees purchased the rifle he used to kill her; jealousy is the first reason he gave to police for purchasing the rifle and killing her; after purchasing the rifle, he went home, read the owner's manual and changed into dark clothing; Voorhees drove to where Carolyn worked, knew she would be alone, and parked one street away so she would not call the police if she saw him; he loaded the rifle in the dark, made his way down a dark path and shot her eleven times from several different angles with a rifle that required the trigger to be pulled each time a shot was fired; after the shooting, he left her lying on the ground and waited two hours before calling 911 and calmly reporting what he had done.

Fifth, there was nothing in the record to indicate bias by a grand juror who reported that a friend had dated Carolyn; and the fact that a petit jury convicted Voorhees of premeditated murder confirms that probable cause existed as to Voorhees' guilt and negates any assertion as to unfairness on the part of the grand jury. The supreme court also found that Voorhees' claim that the state misled the grand jury by withholding blood evidence from the grand jury's consideration was without merit because the trial court rejected Voorhees' claim that the state failed to send his blood for testing and tampered with the blood; and the state tested his blood for Prozac and presented the amount of Prozac in his blood as evidence to the petit jury who convicted him.

Sixth, regarding Voorhees' claims of prosecutorial misconduct at trial, the court found that the state did not cross examine Voorhees by asking him to recite the Commandments for the purpose of impairing his credibility and because no objection was made at trial, the issue was waived. Second, on cross examination, the prosecutor asked Voorhees whether he told a friend that he thought about shooting Carolyn. The court found that the "record reveals" that state had a good faith basis for asking the question and the question was not objected to at trial and was thereby waived. Third, the trial court did not err in not granting a mistrial because the prosecutor showed a picture of Carolyn's blood stained hands and said Voorhees had blood on his

hands. The trial court had cautioned the prosecutor to avoid unnecessary euphemisms.

Seventh, the trial court did not err by deciding Voorhees was not entitled to substitute counsel. The supreme court agreed with the trial court's statement that "Sometimes your attorney is going to have to be very blunt and very honest with you and he's going to say things that you're not going to like to hear. But those matters don't go to issues of ability or competence to represent you."

Finally, none of the grounds raised would constitute ineffective assistance of counsel under the deficiency prong of the Strickland test. The grounds raised were: failure to file motion for change of venue; failure to call certain witnesses and cross examine the state's witnesses; failure to give him the opportunity to testify before the grand jury; failure to procure part of the blood sample so Voorhees could have it examined by his own lab.[1]

Petitioner filed a petition for post-conviction relief. The trial court denied post-conviction relief without an evidentiary hearing. See Order on post-conviction hearing, Docket No. 8, Appendix E. The Minnesota Supreme Court denied appeal of the post-conviction issues and affirmed the conviction. Voorhees v. State, 627 N.W.2d 642 (Minn. 2001). The supreme court made the

---

[1] The Supreme Court found that the record indicated that the blood sample had been depleted by the state's testing to the point that no further testing was possible.

following findings. First, appellate counsel was not ineffective because she failed to move to stay the direct appeal and remand the matter to a post-conviction court in order to allow Voorhees an evidentiary hearing on the issue of ineffective assistance of trial counsel. The court stated that a post-conviction hearing is only necessary when the record is not sufficient to review the claim and the record was sufficient in this case. Thus, appellate counsel was not unreasonable in going forward with a direct appeal. Furthermore, there was no showing of prejudice from appellate counsel's failure to file a petition for rehearing following his direct appeal. Voorhees pursued the matter pro se.

Second, Voorhees was not denied effective assistance of trial counsel because counsel pursued the defense of involuntary intoxication rather than voluntary intoxication or mental illness and appellate counsel was not ineffective for failing to raise the issue on direct appeal. The court relied primarily on its finding on direct appeal that trial counsel was not ineffective, and that the specific issue of choice of defense was not raised on direct appeal, thus, was barred.

Third, Voorhees argued that the post-conviction court had a duty to conduct an evidentiary hearing on the issue of whether that state depleted his blood sample during pretrial testing. The court found that the evidence submitted by Voorhees did not establish that the blood was not depleted or

how it would change his claim in any way from the claim presented on direct appeal. Finally, the court found that the argument could have been raised on direct appeal and was procedurally barred.

Fourth, the court found that the trial court did not err in the involuntary intoxication instruction that it gave, as decided on direct appeal. The court held that Voorhees could have raised the issue of failure to give a voluntary intoxication instruction on direct appeal but because he had not raised it, the issue was procedurally barred.

Finally, the supreme court found that Voorhees was not entitled to counsel or an evidentiary hearing at the post-conviction hearing and the post-conviction court did not err by failing to make findings of fact or conclusions of law, which are only required when an evidentiary hearing is necessary. An evidentiary hearing is not required when the record conclusively supports the denial of post-conviction relief. The court affirmed the post-conviction court. Petitioner filed a petition for habeas corpus on August 20, 2001.

## II. DISCUSSION

Habeas corpus is a federal remedy for a state prisoner's challenge to the legality of his or her detention. See 28 U.S.C. § 2254(a); Preiser v. Rodriguez, 411 U.S. 475, 485-86 (1973). Federal courts may entertain a habeas corpus petition only on the grounds that the prisoner's incarceration

violates the United States Constitution or other federal law. See 28 U.S.C. § 2254(a); Wycoff v. Nix, 869 F.2d 1111, 1113 (8th Cir. 1989). A § 2254 petitioner is entitled to habeas relief only if (1) the relevant state court decision or proceedings were "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) the decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (2).

In the petition, Voorhees first alleges that the grand jury was unconstitutionally selected and impaneled and that his right to due process was violated because the prosecutor withheld evidence from the grand jury. Second, Voorhees contends that he was denied effective assistance of counsel at the trial and appellate court level and that he was denied appointment of counsel for filing a post conviction petition. Third, he alleges the trial court gave misleading instructions and failed to instruct the jury on voluntary intoxication in violation of the Fifth and Sixth Amendments. Fourth, Voorhees alleges the Minnesota Supreme Court failed to review the record on appeal and failed to rule on the issue of the trial court's failure to give a jury instruction on voluntary intoxication. Voorhees' fifth basis for his habeas petition is that the prosecutor violated his "due process and equal protection rights to a fundamentally fair trial" by committing several acts of prosecutorial

misconduct. Grounds six and seven of the habeas petition seek relief for any other issues the court finds on review and seeks to amend the petition, if counsel is appointed. For convenience, the claims are discussed in the following categories: grand jury, ineffective assistance of counsel, prosecutorial misconduct, and due process.

### A. Grand Jury

Voorhees alleges two grounds related to the grand jury proceedings. First, he alleges that the grand jury was unconstitutionally selected and impaneled because a friend of the victim was allowed to sit on the grand jury. Voorhees argues that the Fourteenth Amendment calls for due process of the law and equal protection, thus, it is not enough that the petit jury convicted him of first-degree murder on an indictment that was obtained in such a way.

The grand jury proceedings transcript reveals that a grand juror told the prosecutor that he knew Carolyn because a friend of his dated her years ago. (GJ Tr. at 14). The prosecutor asked whether there was anything about that relationship or anything that would affect the juror's impartiality. Id. The juror said he didn't think so but agreed to tell the prosecutor if, at any time, he believed he could not be fair or impartial. Id. The prosecutor advised that the grand juror could be excused at any time with no problem. Id.

Voorhees also argues that the prosecutor withheld blood evidence regarding intoxication from the grand jury and misled them regarding the whereabouts of the blood sample.[2] Assuming the Court could construe Voorhees' claims to set forth cognizable claims of a constitutional violation, review of United States Supreme Court precedent is necessary.

In Bank of Nova Scotia v. United States, the Court held that, as a general matter, a district court may not dismiss an indictment for errors in grand jury proceedings unless such errors prejudiced the defendants. 487 U.S. 250, 253 (1988). In United States v. Mechanik, the Court held that defendants who discovered an error in the grand jury proceedings after trial had commenced were not entitled to a retrial because the petit jury's verdict rendered harmless any conceivable error in the indictment that might have flowed from the violation. 475 U.S. 66, 72-73 (1986). United States v. Williams held that it was not appropriate to impose an obligation on the prosecutor to present exculpatory evidence to the grand jury because the grand jury sits, not to determine guilt or innocence, but to assess whether there is adequate basis for bringing the charge. 504 U.S. 36, 51-51 (1992).

---

[2] Grand jurors questioned the prosecutor on whether there was evidence of intoxication in the blood or urine samples taken. (GJ. Tr. 84-85, 87-88.) Voorhees alleges the prosecutor said there was a backup at the lab and the samples had not been tested but that the prosecutor knew the blood sample was still sitting in the evidence room and had not been sent out for testing.

The Minnesota Supreme Court found that there was nothing in the record to indicate bias by the grand juror who reported that a friend had dated the victim. State v. Voorhees, 596 N.W.2d at 254. This Court agrees.

The supreme court also found that Voorhees' claim that the state misled the grand jury by withholding blood evidence from the grand jury's consideration was without merit because the trial court rejected Voorhees' claim that the state failed to send his blood for testing and tampered with the blood; and the state tested his blood for Prozac and presented the amount of Prozac in his blood as evidence to the petit jury who convicted him. State v. Voorhees, 596 N.W.2d at 254. Voorhees has not established by clear and convincing evidence that these findings were based on an unreasonable determination of the facts in light of the evidence presented and is not entitled to relief under 28 U.S.C. §2254(d)(2).

The Minnesota Supreme Court held that the fact that a petit jury convicted Voorhees of premeditated murder confirms that probable cause existed as to Voorhees' guilt and negates any assertion as to unfairness on the part of the grand jury. Voorhees has not met the standard under 28 U.S.C. §2254(d)(1), that the state court decision involved an unreasonable application of clearly established federal law, in this case, Supreme Court precedent that a petit jury's verdict rendered harmless any conceivable error in the indictment, which requires only a finding that there was probable cause that the accused

was guilty of the crime charged. United States v. Mechanik, 475 U.S. 66, 72-73 (1986).

## B. Ineffective Assistance of Counsel

Voorhees asserts that he was deprived of effective assistance of counsel by trial counsel and appellate counsel. He alleges that he had a conflict with trial counsel and the trial court would not hold a hearing on his request for substitute counsel early in the proceedings. He argues that trial counsel was ineffective because he failed to investigate the defense of involuntary intoxication and went against the advice of two experts that he did not meet the requirements of involuntary intoxication. Along the same lines, Voorhees argues that trial counsel was ineffective for failing to focus on the merits of voluntary intoxication and failing to request a jury instruction on voluntary intoxication.

Voorhees also alleges that counsel was ineffective because he failed to object to a question by the prosecutor on cross examination and that the question violated his right to confrontation of witnesses against him. He alleges that trial counsel was ineffective for failing to cross examine the medical examiner on time of death because Voorhees believes the medical examiner changed his original autopsy report to fit premeditation.

Voorhees alleges that appellate counsel was ineffective because she failed to investigate the blood evidence issue, failed to investigate the ineffective

assistance of trial counsel issue, failed to stay direct appeal to expand the record in the post conviction court, failed to contact witnesses concerning the ineffective assistance of counsel claim, argued a no merit appeal, and failed to file a motion for a rehearing.

**1. Request for Substitute Counsel**

The Sixth Amendment guarantees the right to counsel that is unimpaired by conflicts of interest. Smith v. Lockhart, 923 F.2d 1314, 1320 (8th Cir. 1991). A criminal defendant must show good cause, such as irreconcilable conflict or a complete breakdown in communication, to substitute counsel. Id. A criminal defendant does not have the absolute right to counsel of his choosing. Carey v. State of Minnesota, 767 F.2d 440, 441 (8th Cir. 1985). The Sixth Amendment does not guarantee a meaningful relationship between the accused and his counsel. Morris v. Slappy, 461 U.S. 1, 14 (1983).

On direct appeal, the Minnesota Supreme Court found that the trial court did not err by deciding Voorhees was not entitled to substitute counsel. The court agreed with the trial court's statement that "Sometimes your attorney is going to have to be very blunt and very honest with you and he's going to say things that you're not going to like to hear. But those matters don't go to issues of ability or competence to represent you." State v. Voorhees, 596 N.W.2d at 255 (Minn. 1999).

Voorhees contends that there was a conflict with counsel because counsel yelled at him and belittled him. This is not the type of showing that would entitle a criminal defendant to an evidentiary hearing regarding a conflict with counsel, nor does it provide good cause to substitute counsel. See Morris v. Slappy, 461 U.S. at 12 (no Sixth Amendment right to meaningful attorney-client relationship where defendant refused to cooperate with counsel). Voorhees has not shown by clear and convincing evidence that the trial court's finding was in error, nor has he shown that such a finding is contrary to federal law.

### 2. Ineffective Assistance of Trial Counsel

To prevail on a claim of ineffective assistance of counsel in violation of the Sixth Amendment a petitioner must establish that his attorney's performance "fell below an objective standard of reasonableness," and "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 688, 694 (1984). The Court must look at the evidence before the judge or jury as a whole to determine the effect of alleged attorney errors. Id. at 695. The ultimate focus of the inquiry is fundamental fairness in the proceeding, with relief granted only where there has been a breakdown in the adversarial process. Id. at 696.

On direct appeal of Voorhees' ineffective assistance of counsel claims, the Minnesota Supreme Court concluded that none of the grounds raised would constitute ineffective assistance under the deficiency prong of the Strickland test. State v. Voorhees, 596 N.W.2d at 255 (Minn. 1999). On review of the post-conviction court, the Minnesota Supreme Court found that Voorhees was not denied effective assistance of trial counsel because counsel pursued the defense of involuntary intoxication rather than voluntary intoxication or mental illness. Voorhees v. State, 627 N.W.2d at 650. The court relied primarily on its finding on direct appeal that trial counsel was not ineffective, and that the specific issue of choice of defense was not raised on direct appeal, thus, was barred. Id.

Voorhees contends that counsel's decision to proceed on an involuntary intoxication defense rather than a voluntary intoxication defense and failure to request a voluntary intoxication jury instruction was unreasonable.

The prosecution had witnesses to counter both a voluntary or involuntary intoxication defense.[3] First, the clerk who sold Voorhees the gun

---

[3] The elements of involuntary intoxication under Minnesota law require the defendant to show by a preponderance of the evidence that first, he (1) was compelled to take the intoxicating substance against his will or (2) was unaware that because a particular susceptibility to it the substance would have a grossly intoxicating effect upon him or (3) was innocently mistaken as to the nature of the substance taken or (4) became unexpectedly intoxicated as a result of taking a medically prescribed drug; second, his intoxication was

on the night of the shooting testified that he did not detect the odor of alcohol on Voorhees and that he seemed to be coherent, did not slur his speech, and did not seem out of the ordinary at all. (T. Tr. 262-270.) Second, the bartender who served Voorhees drinks between 9:00 p.m. and midnight on the night of the shooting testified that he served Voorhees three or four beers and one screwdriver and that Voorhees was quiet, polite, did not bother anyone, did not slur his speech, and did not appear to be intoxicated. (T. Tr. 336-340.) Voorhees testified that he had several more drinks than described by the bartender. (T. Tr. 844-845 ). Third, the prosecution offered evidence that there was methamphetamine in Voorhees' urine sample but not in his blood sample, there was no alcohol in his blood sample, and there was Prozac in his blood sample at a nontoxic, nontherapeutic level. (T. Tr. 360-367.) Voorhees testified that he did "a little methamphetamine" on Monday, August 5. (T. Tr. 828-829). Fourth, the prosecution offered evidence that an Intoxilizer test indicated that Voorhees had a blood alcohol level of .03 approximately three

---

caused by the intoxicating substance in question and not by some other intoxicant; third, at the time of the killing he was temporarily mentally ill by reason of involuntary intoxication. State v. Voorhees, 596 N.W.2d at 250, citing City of Minneapolis v. Altimus, 238 N.W.2d 851 (Minn. 1976)). Minn. Stat. § 609.075 provides:

> An act committed while in a state of voluntary intoxication is not less criminal by reason thereof, but when a particular intent or other state of mind is a necessary element to constitute a particular crime, the fact of intoxication may be taken into consideration in determining such intent or state of mind.

hours after the shooting, which would indicate his blood alcohol level would have been .065 to .07 around 2:00 a.m., the approximate time of the shooting. (T. Tr. 391, 473-74.)

Under these circumstances, defense counsel faced an uphill battle to prove that Voorhees would meet the elements of either voluntary or involuntary intoxication because a reasonable juror could infer that he was not intoxicated but maintained the requisite intent to premeditate the murder. The involuntary intoxication defense had the potential to result in a not guilty verdict. See City of Minneapolis v. Altimus, 238 N.W.2d 851, 855-57 (Minn. 1976)(defining involuntary intoxication defense). The voluntary intoxication defense could only establish that he did not have the requisite intent to premeditate, thus, could not prevent conviction on a lesser offense. See State v. Torres, 632 N.W.2d 609, 615 n.2 (Minn. 2001)(defining voluntary intoxication as defense).

The record also indicates that prior to speaking with an attorney, Voorhees made numerous statements to the police. His call to 911 to report that he shot Carolyn was recorded. He told the 911 operator that he was on Prozac and had been drinking and snorting crank. (T. Tr. 82.) When formally questioned by police, before requesting an attorney, Voorhees stated that he had been on Prozac and that it changes a person. (T. Tr. 554.) He told police that one night he woke up and felt like strangling himself. Id. He told police

Prozac has side effects and one side effect is that it makes a person suicidal. (T. Tr. 555.) Thus, there was evidence in the record to support a defense of involuntary intoxication.

Defense counsel presented expert testimony, as limited by the trial court's ruling, that Prozac may cause a person to become overanxious. (T. Tr. 743). The expert further testified that, in rare cases, Prozac may unmask psychosis. (T. Tr. 743.) He testified that becoming suicidal or homicidal may be a side effect of Prozac, "but that's very infrequent." (T. Tr. 746-747.) Evidence was presented that Voorhees was suicidal at the time of the killing. (T. Tr. 843-847). It was not unreasonable to pursue an involuntary intoxication defense under these circumstances. Therefore, trial counsel's performance was not deficient under an objective standard of reasonableness.

Furthermore, it was reasonable for defense counsel to not ask for a voluntary intoxication instruction. The evidence of voluntary intoxication was not particularly strong because the prosecution had witnesses who were with Voorhees before and after the shooting who testified that he did not appear to be intoxicated. Offering the jury an alternative explanation for defendant's behavior would detract from the strength of the involuntary intoxication defense.

Next, Voorhees contends counsel was ineffective for failing to cross examine the medical examiner regarding the time of death for the purpose of

showing that Carolyn died immediately. The jury had already heard testimony that the victim had been shot eleven times, at close range, and from different angles. An attempt by defense counsel to get the medical examiner to admit that the victim died immediately may only have angered the jury. Although admission that the victim died immediately may negate the inference that Voorhees left her there to die when she could have been saved, it also creates a reasonable inference that Voorhees shot her eleven times to make sure she would die immediately. Trial counsel could reasonably have determined that it would not benefit defendant to elicit such testimony.

Finally, Voorhees contends that counsel was ineffective for failing to object to the prosecutor's questioning on cross examination wherein the prosecutor asked Voorhees whether he had told Rob Konczak that he thought about killing Carolyn. Voorhees testified that he had never said such a thing. (T. Tr. 920-921).

Even if the Court accepts that counsel's failure to object fell below an objectively reasonable standard, under the second prong of the Strickland test, Voorhees must show that he was prejudiced by his attorney's error. The question the court must answer to determine prejudice is whether there is a reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been different.

On direct appeal, the Minnesota Supreme Court found that the following evidence was sufficient to support a finding that Voorhees was guilty of premeditated murder: Voorhees and his wife were in the process of a divorce that Voorhees did not want; Voorhees became jealous when he saw Carolyn purchase a douche at Wal-Mart and suspected she was sleeping with another man; shortly after seeing her at Wal-Mart, Voorhees purchased the rifle he used to kill her; jealousy is the first reason he gave to police for purchasing the rifle and killing her; after purchasing the rifle, he went home, read the owner's manual and changed into dark clothing; Voorhees drove to where Carolyn worked, knew she would be alone, and parked one street away so she would not call the police if she saw him; he loaded the rifle in the dark, made his way down a dark path and shot her eleven times from several different angles with a rifle that required the trigger to be pulled each time a shot was fired; after the shooting, he left her lying on the ground and waited two hours before calling 911 and calmly reporting what he had done. State v. Voorhees, 596 N.W.2d at 253.

The prosecutor's questioning on cross examination, that created an inference that Voorhees had told a friend that he had thought about killing Carolyn, was not necessary to a finding of premeditation. Based on the weight of evidence presented against Voorhees, the Court does not find a reasonable probability that the result of the proceeding would have been different if trial

counsel had objected to the question and had it stricken from the record. Thus, Voorhees has not established the second element under Strickland.

### 3. Ineffective Assistance of Appellate Counsel

On review of the post-conviction court, the Minnesota Supreme Court made the following findings. First, appellate counsel was not ineffective because she failed to move to stay the direct appeal and remand the matter to a post-conviction court in order to allow Voorhees the opportunity for an evidentiary hearing on the issue of ineffective assistance of trial counsel. Voorhees v. State, 627 N.W.2d at 649. The court noted that a post-conviction hearing is only necessary when the record is not sufficient to review the claim and found that the record was sufficient in this case. Id. The state court's findings are presumed correct, see 28 U.S.C. §2254(e)(1), and Voorhees has not shown by clear and convincing evidence that the record was not sufficient for review without an evidentiary hearing. Thus, he is not entitled to habeas relief. See id. § 2254(d)(2).

The state court also found that Voorhees did not make a showing of prejudice from appellate counsel's failure to file a petition for rehearing following his direct appeal. Voorhees v. State, 627 N.W.2d at 649. Voorhees pursued the matter pro se and was not denied the opportunity to request a rehearing. Id. Voorhees has not shown that there is a reasonable probability that, but for appellate counsel's alleged errors, the result of his appeal would

have been different. Therefore, he has not established an essential element of an ineffective assistance of counsel claim under Strickland and is not entitled to habeas relief.

Voorhees contends that appellate counsel was ineffective for failing to pursue the blood evidence issue on direct appeal. On review of the pos-conviction court, the Minnesota Supreme Court found that Voorhees was not entitled to an evidentiary hearing on the issue of whether the state mishandled or tampered with his blood sample and intentionally prevented him from conducting his own testing. Voorhees v. State, 627 N.W.2d at 651. The court noted that Voorhees failed to explain how the evidence he submitted would show that the blood sample had not been depleted by the state's testing. Id.

Even assuming reasonable appellate counsel would have pursued this allegation, Voorhees has not shown prejudice. The blood samples were taken to test the level of drugs and alcohol in Voorhees' blood. Voorhees testified at trial that he had stopped taking Prozac at least several days before the night of the shooting. (T. Tr. 825-826). This testimony was corroborated by the low level of Prozac in his blood. (T. Tr. 360-367). He testified that he had been drinking alcohol on the night of the shooting. (T. Tr. 844-845). The bartender who served him testified that he served him three or four beers and a mixed drink. (T. Tr. 336-340). Voorhees was given an Intoxilizer test several hours after the shooting and had a blood alcohol level of .03. (T. Tr. 391).

Testimony by a number of witnesses who saw Voorhees before and after the shooting suggested that he did not appear to be intoxicated. (T. Tr. 262-270, 336-340). Therefore, it is unlikely that Voorhees inability to have his blood tested independently affected the outcome of his trial. For this reason, Voorhees has not shown that counsel was ineffective for failing to pursue the issue or that the court denied him due process by not conducting an evidentiary hearing on post conviction review.

C. **Prosecutorial Misconduct**

Voorhees alleges that conduct by the prosecutor violated his rights to due process and to a fair trial. He alleges that the prosecutor had him pulled out of the psychiatric ward while he was under suicide watch, denied him proper care, and questioned him in such a frame of mind. He repeats his allegations regarding the prosecutor's conduct at the grand jury proceedings and alleges that the prosecutor did not call the grand jury until after "the twenty day requirement."

Voorhees alleges that the prosecutor knew that the medical examiner first concluded that the victim died rapidly but got the medical examiner to change his testimony to indicate that the victim lived thirty to sixty minutes. He alleges that the prosecutor "let the public defender go forth with a no merit defense." He alleges that the prosecutor brought in hearsay statements of Rob Konczak, while knowing the statements were untrue.

Finally, he alleges the prosecutor failed to make sure the judge gave proper instructions.

Prosecutorial misconduct does not merit habeas corpus relief unless the prosecutor committed an error that effectively eliminated the defendant's due process right to a fair trial. Roberts v. Bowersox, 137 F.3d 1062, 1066 (8th Cir. 1998) citing Darden v. Wainwright, 477 U.S. 168, 181 (1986). "'[I]t is not enough that the prosecutors' remarks were undesirable or even universally condemned.... Rather, the 'relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Mack v. Caspari, 92 F.3d 637, 643 (8th Cir. 1996) quoting Darden v. Wainwright, 477 U.S. at 181. Thus, a habeas petitioner

> "bears the heavy burden of showing 'that the alleged improprieties were so egregious that they fatally infected the proceedings and rendered his entire trial fundamentally unfair. Under this standard, a petitioner must show that there is a reasonable probability that the error complained of affected the outcome of the trial -- i.e., that absent the alleged impropriety, the verdict probably would have been different.'"

Mack, 92 F.3d at 643 (emphasis added) (quoting Jones v. Jones, 938 F.2d 838, 844-45 (8th Cir. 1991)). When assessing whether a habeas petitioner has met this "heavy burden," a federal court must examine the totality of the circumstances in order to determine whether there is a reasonable probability

that the challenged remarks affected the outcome of the trial. Roberts, 137 F.3d at 1066 (citing Antwine v. Delo, 54 F.3d 1357, 1363 (8th Cir. 1995)).

Voorhees' claim that the prosecutor had him pulled out of the psychiatric ward for questioning is not supported by the record and is not the type of conduct that raises an issue of whether the trial was fundamentally unfair. The allegation does not state a claim upon which habeas relief can be granted.

Voorhees' claims regarding the prosecutor's alleged misconduct at the grand jury proceedings have been addressed with the exception of the allegation that the prosecutor ignored the "twenty day requirement." Respondent states that it is unaware of any twenty day requirement. Voorhees has not cited authority for this claim or explained how it caused his trial to be fundamentally unfair. Thus, the claim can not stand.

Voorhees next argues that the prosecutor allowed the public defender to go forward with a "no merit defense" and failed to make sure the trial judge gave proper jury instructions. To hold the prosecutor responsible for this alleged misconduct, the Court would have to find that the public defender was ineffective and the trial court failed to give proper jury instructions. Thus, the claims have been addressed in the context of Voorhees' ineffective assistance of counsel and due process claims that are based on the same underlying facts.

Finally, Voorhees alleges that the prosecutor improperly questioned him on cross examination by asking him whether he told Rob Konczak that he thought about killing Carolyn. Although Rob Konczak was on the prosecutor's witness list, he was not called to testify at trial.[4]

These facts are quite similar to the facts in Wycoff v. Nix, 869 F.2d 1111 (8th Cir. 1989). In Wycoff, the prosecutor based his cross examination of a defense witness on an investigative report that summarized a conversation between the defense witness and a prison guard, as told by the prison guard. Id. at 1114. The prosecutor subpoenaed the prison guard but when he arrived at the courthouse, he denied having the conversation at issue. Id. The prosecutor did not call the prison guard as a witness. Id. When the prosecutor asked the defense witness about the alleged conversation with the prison guard, he denied having the conversation. Id. The prosecutor did not impeach the defense witness' denial of the conversation. Id. Thus, the undenied, unimpeached testimony of the witness was that the statement was never made. Id. The Eighth Circuit held that "there is nothing in the record necessitating a

---

[4] Petitioner alleges that the prosecutor did not make an offer of proof that Mr. Konczak made such a statement to Detective Moyle and that the prosecutor was in possession of a report from a private investigator that stated Mr. Konczak would testify that he never said such a thing, if he was called to testify. (Mem. Supp. Pet. Writ Habeas Corpus, Doc. No. 2.) The Minnesota Supreme Court, on direct appeal, found that the "record reveals" that the state had a good faith basis for asking the question and the question was not objected to at trial and was thereby waived. Voorhees v. State, 596 N.W.2d at 254.

correction and no error of constitutional measure was committed." Id. Thus, under very similar facts, Voorhees has not shown that the state court's decision was contrary to clearly established federal law.

**D. Due process**

Voorhees contends that a number of errors by the courts below violated his right to due process and to a fair trial. He argues that the trial court's jury instructions were misleading and that the trial court failed to instruct the jury sua sponte on voluntary intoxication. He alleges that the Minnesota Supreme Court violated his constitutional rights by failing to review the record on appeal, considering improper evidence, and failing to rule on important issues that the Court found were procedurally barred.

Habeas relief is available only where the failure to give such jury instructions created a fundamental defect resulting in a complete miscarriage of justice. Crump v. Caspirini, 116 F.3d 326, 327 (8th Cir. 1997). Determinations of state law regarding the giving of jury instructions are binding. Id.

The Minnesota Supreme Court found that Voorhees received more than he was entitled to under the law by receiving any instruction on involuntary intoxication because he did not make a prima facie showing on any element of that defense under Minnesota state law. State v. Voorhees, 596

N.W.2d 241, 250 (Minn. 1999).[5] A habeas court may not examine a state court's rulings on issues of state law. Estelle v. McGuire, 502 U.S. 62, 67-68 (1991).

Voorhees did not ask for an instruction on voluntary intoxication. As discussed above, his counsel was not ineffective for failing to ask for such an instruction because there was limited evidence of voluntary intoxication and it was appropriate strategy to rely on an involuntary intoxication defense. Therefore, the trial court's failure to give an instruction sua sponte was not a fundamental defect resulting in a complete miscarriage of justice.

Voorhees' allegations that the Minnesota Supreme Court failed to review the record and relied on improper evidence are unsupported by the record. The fact that the Minnesota Supreme Court failed to rule on issues that it found were procedurally barred was a proper determination based on state law[6] that is not reviewable by the habeas court without a showing of cause for the default and actual prejudice. Charron v. Gammon, 69 F.3d 851, 857 (8th Cir. 1995). However, this Court has addressed those issues that the

---

[5] The elements of involuntary intoxication are described in note 2, supra.

[6] See Voorhees v. State, 627 N.W.2d 642 (Minn. 2001) (citing State v. Knaffla, 243 N.W.2d 737, 741 (Minn. 1976)) (holding that any issues that could have been raised on direct appeal but were not are procedurally barred).

state court found to be procedurally barred. Voorhees was not prejudiced by the alleged deficiencies in the state court's review of his claims on appeal.

Based upon the above, and upon all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that Petitioner Brad Alan Voorhees' Petition pursuant to 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody (Doc. No. 1) be **DENIED** and the matter be **DISMISSED WITH PREJUDICE**.

Dated: August 15, 2002

JONATHAN LEBEDOFF
Chief United States Magistrate Judge

Pursuant to D. Minn. LR 72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court and serving all parties by Sept. 3, 2002, a copy of written objections which specifically identify the portions of the Report or Recommendation to which objection is being made, the basis for the objections, and a brief in support thereof. A party may respond to the objecting party's brief within ten days after service thereof. All briefs filed under this rule shall be limited to ten pages. A District Judge shall make a de novo determination of those portions to which objection is made. Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the United States Court of Appeals for the Eighth Circuit.